1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Offen Petroleum LLC,                    No. CV-25-00061-TUC-JCH (EJM)

10                    Plaintiff,

11  v.                                      **REPORT AND RECOMMENDATION**

12  L&J Express, LLC, *et al.*,

13                    Defendants.

14       Currently pending before the Court is Plaintiff's Application for Writ of Attachment
15  With Notice (Doc. 99).  Defendant AJMR Distributors LLC filed its objection (Doc. 102)
16  and Plaintiff replied (Doc. 103).  Plaintiff seeks attachment of certain property allegedly
17  owned by Defendant AJMR Distributors LLC pursuant to A.R.S. § 12-1521.  (*See* Doc.
18  99.)  Defendant AJMR Distributors LLC contends that it does not own the property in its
19  possession and Plaintiff Offen is not entitled to a writ of attachment.  (*See* Doc. 102.)

20       Pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure, this matter
21  was referred to Magistrate Judge Markovich for Report and Recommendation.  On August
22  22, 2025, the Court held a probable validity hearing and heard witness testimony.  Minute
23  Entry 8/22/2025 (Doc. 106).  Having received the official transcript, the motion is ripe for
24  review.  The Magistrate Judge recommends that the District Court deny the Plaintiff's
25  application (Doc. 99).

26  . . .

27  . . .

28  . . .

I.      **BACKGROUND**

On February 12, 2025, Plaintiff Offen Petroleum, LLC, filed its Complaint against various Defendants, including Defendant AJMR Distributors, LLC.  *See* Compl. (Doc. 1). Plaintiff identifies itself as a wholesale fuel distributor.  Compl. (Doc. 1) at ¶ 30; Hr'g Tr. 8/22/2025 (Doc. 113) at 10:12–16.  Plaintiff's Complaint (Doc. 1) contends that during the months of October, November, and December 2024, seventy-four loads of fuel were taken from Offen.  *See id.* at ¶¶ 43–65.  On July 9, 2025, Plaintiff filed its Application for Writ of Attachment with Notice (Doc. 99) for fuel being stored by Defendant AJMR in Rio Rico, Arizona.

*A.     Aaron Hackerott*

Plaintiff's President and Chief Operating Officer, Aaron Hackerott testified at the probable validity hearing.  *See* Pl.'s Witness List (Doc. 108); *see also* Hr'g Tr. 8/22/2025 (Doc. 113) at 9–52.  Mr. Hackerott described his job responsibilities to include ensuring the organization has a vision, has the appropriate people on staff, and generates cash on a daily basis for its shareholders.  Hr'g Tr. 8/22/2025 (Doc. 113) at 10:6–11.

**1.  Offen's Business**

Mr. Hackerott described Offen as a wholesale fuel distributor, which buys and sells gasoline and diesel, as well as propane, lubricants, and diesel exhaust fluid.  Hr'g Tr. 8/22/2025 (Doc. 113) at 10:12–22.  He identified Offen's customers to include neighborhood gas stations, big box retailers, and municipalities, as well as other distributors.  *Id.*  Mr. Hackerott explained that upon establishing a relationship with a potential fuel customer, that customer will submit a credit application to Offen.  *Id.* at 10:23–11:6.  Upon credit approval, Offen will begin sending pricing information to the customer, and if the price is acceptable, Offen will sell them fuel.  *Id.*

Mr. Hackerott described the two methods that Offen sells fuel to its customers.  *Id.* at 11:7–20.  The first method involves transportation or delivery of the fuel with Offen's truck or third party carrier.  Hr'g Tr. 8/22/2025 (Doc. 113) at 11:7–20.  The second method involves direct sales to the customer—Offen provides access to its loading number at the

fuel terminal, and customers send their own carrier to the terminal to load. *Id*. Offen will receive a bill of lading from the terminal and invoice the customer for the load. *Id*. Offen will then draft the customer's account electronically; Mr. Hackerott estimated that this occurs in eight (8) to ten (10) business days. *Id*.

Mr. Hackerott testified his understanding is the United States-Mexico border remains closed to cross-border fuel trucking. *Id*. at 31:5–12, 38:5–7. He is unaware of a definitive date when the border will reopen. Hr'g Tr. 8/22/2025 (Doc. 113) at 31:13–16, 38:1–4.

### 2.  Global Companies

Mr. Hackerott testified that of the Defendants named in the Complaint, Global Companies was the only direct customer of Offen. Hr'g Tr. 8/22/2025 (Doc. 113) at 11:25–12:5. Mr. Hackerott further testified that Global Companies contacted Offen and asked if it could supply them fuel in Tucson, Arizona. *Id*. at 12:18–13:13, 49:14–21. Global expressed an intention to transport the fuel into Mexico. *Id*. at 37:18–25, 49:14–21. Mr. Hackerott explained Offen and Global Companies buy and sell fuel from one another throughout the United States. *Id*. at 12:18–13:13. Offen provided its loading number for Marathon Oil or Marathon Petroleum to Global Companies. *Id*. at 12:18–13:13, 51:11–13. Mr. Hackerott testified that Offen set up a specific group of third-party carriers per Global Companies' request. Hr'g Tr. 8/22/2025 (Doc. 113) at 12:18–13:13, 51:11–13. These carriers then proceeded to load on Offen's account. *Id*. Offen then sent the bills of ladings to Global Companies, who would confirm their loads. *Id*. at 12:18–13:13. Mr. Hackerott observed that Global Companies would typically take approximately two (2) weeks to follow-up regarding the bills of lading. *Id*.

### 3.  Missing Fuel

Mr. Hackerott testified that sometime in November, Offen was sending information to Global Companies, and Global began reporting that the loads were not theirs. Hr'g Tr. 8/22/2025 (Doc. 113) at 13:14–23. Mr. Hackerott further testified that by the time Offen stopped what was happening, Global Companies had denied purchasing more than seventy

(70) loads. *Id.* at 13:14–14:6. Mr. Hackerott described these loads as unaccounted for with regard to customer information. *Id.*

Mr. Hackerott testified that he investigated which parties loaded the fuel loads at issue. *Id.* at 14:16–22. Mr. Hackerott further testified that he spoke with the third-party carriers that had loaded the fuel. *Id.* at 15:9–11. Mr. Hackerott estimated the value of the approximately seventy (70) loads of fuel at 1.4 million USD. Hr'g Tr. 8/22/2025 (Doc. 113) at 18:4–8, 31:17–23. Mr. Hackerott testified that this valuation is based upon a trailer holding approximately 8,000 gallons of fuel, and which he estimated is $20,000.00 per load of fuel.[1] *Id.* at 35:6–17.

Mr. Hackerott testified that of the 74 loads which Offen alleges are unaccounted for, one (1) load has since been found. *Id.* at 25:2–8. Mr. Hackerott estimated the load which was accounted for was valued at approximately $18,000.00. *Id.* at 25:9–10. Mr. Hackerott further testified his understanding was the carrier EZ Fuel and customer West Plains Propane took responsibility for that load. *Id.* at 25:11–13. Mr. Hackerott indicated that West Plains Propane ultimately paid for that load. Hr'g Tr. 8/22/2025 (Doc. 113) at 25:14–16. Mr. Hackerott reported that Offen has paid its fuel supplier for the remaining loads at issue. *Id.* at 25:17–22.

#### 4. **Bills of Lading**

Mr. Hackerott described the bills of lading (BOLs) included in Plaintiff's Exhibit 1. Hr'g Tr. 8/22/2025 (Doc. 113) at 19:9:–20:6. Mr. Hackerott testified that BOLs are typically generated at the fuel terminal. *Id.* Mr. Hackerott explained that a driver would go into the terminal; enter the loading number giving them authorization to load; and once they were finished loading the trailer, a BOL would be printed. *Id.* The BOL typically has the date and time of the loading; the fuel supplier's name; the customer name; the loading number; the fuel volume; and sometimes the chemical properties of the product. *Id.*

---

[1] Mr. Hackerott did not provide a specific price per gallon for gasoline and/or diesel fuel, but based his estimate on his "general knowledge of gasoline and diesel prices across the United States." Hr'g Tr. 8/22/2025 (Doc. 113) at 35:6–17.

Mr. Hackerott clarified that a BOL such as that found on page 34 of 132 of Exhibit 1 represents a bill of lading generated at the terminal and signed by the carrier. *Id*. at 21:8–23. Whereas, page 33 of 132 depicts an electronic bill of lading generated from a data service. Hr'g Tr. 8/22/2025 (Doc. 113) at 21:20–22:5. Mr. Hackerott described the electronic BOL as a "regenerated bill of lading." *Id*. He observed that this occurs when a third-party carrier did not provide Offen the BOL itself from an original format. *Id*. Mr. Hackerott further testified regarding the information contained within each BOL. *Id*. at 44:1–48:3.

Mr. Hackerott explained that Exhibit 2 reflects the outstanding BOL numbers, which correlate with the BOLs that were attached to the Complaint and submitted as part of Exhibit 1. *Id*. at 23:23–24:10.

## 5. Relationship to Defendant AJMR Distributors

Mr. Hackerott denied that AJMR was an Offen customer, and indicated they were not authorized to load fuel with Offen's loading number. Hr'g Tr. 8/22/2025 (Doc. 113) at 17:22–18:3, 36:15–22. Mr. Hackerott admitted that he does not possess any firsthand knowledge or other concrete evidence that AJMR failed to pay their direct suppliers for any loads that allegedly came from Offen. *Id*. at 38:21–39:6. Mr. Hackerott acknowledged that his information regarding AJMR allegedly owning fuel in the storage yard came from three (3) individuals that contacted him.[2] *Id*. at 39:8–12. Mr. Hackerott's only knowledge regarding AJMR allegedly delivering fuel into Mexico came from "conversations [he] had with some of Offen's customers' third-party carriers." *Id*. at 39:13–17.

Mr. Hackerott confirmed that he spoke with Mr. Valencia of AJMR on January 6, 2025, and asked for payment. *Id*. at 39:25–40:7. Mr. Hackerott did not have any firsthand evidence that AJMR owes Offen the $1.4 million sought in this lawsuit. Hr'g Tr. 8/22/2025 (Doc. 113) at 40:18–22. Mr. Hackerott confirmed that AJMR does not appear anywhere on the bills of lading contained in Exhibit 1. *Id*. at 40:23–41:1. Mr. Hackerott

---

[2] Mr. Hackerott did not identify the individuals during his testimony, but their names were included in his Affidavit attached to Plaintiff's Application for Writ (Doc. 99).

1    acknowledged that he did not ask any of the carriers or third-party carriers identified by
2    the SCAC on the BOLs whether or not they delivered fuel to third-party recipients other
3    than AJMR.  *Id*. at 41:22–42:3.

4        **B.    *Alvaro J. Valencia***

5        Defendant AJMR Distributors' fuel division owner, Alvaro Valencia, testified at the
6    probable validity hearing.  *See* Def. AJMR Distributor LLC's Witness List (Doc. 110); *see
7    also* Hr'g Tr. 8/22/2025 (Doc. 113) at 53–89.  Mr. Valencia described AJMR's business as
8    selling fuel to customers that import their product into Mexico.  *Id*. at 53:12–20.

9        **1.    AJMR's Business—Overview**

10       Mr. Valencia explained that with regard to this case particularly, AJMR bought fuel,
11   specifically diesel and gasoline, from Judean Group from Texas.  Hr'g Tr. 8/22/2025 (Doc.
12   113) at 53:21–54:14.  Mr. Valencia further detailed that AJMR ordered a certain number
13   of gallons of either diesel or gasoline from Judaean Group, who then provided codes for
14   loading the fuel at the Kinder Morgan facilities in either Tucson or Phoenix, Arizona.  *Id*.
15   at 53:21–54:14, 57:24–58:5.  Sometimes AJMR hires transportation companies, and
16   sometimes the company that is selling to AJMR provides transportation.  *Id*. at 53:21–
17   54:14.  Mr. Valencia testified that AJMR's business ends when the fuel is brought to their
18   yard in Nogales, Arizona.  *Id*. at 53:21–54:14, 55:1–5.  At that point, their client comes
19   into the United States and takes the fuel into Mexico.  *Id*. at 53:21–54:14, 55:1–5, 82:19–
20   21.  Mr. Valencia further testified that AJMR's customers in Mexico, such as Gas Azul,
21   are responsible for obtaining permits to bring the fuel into Mexico.  Hr'g Tr. 8/22/2025
22   (Doc. 113) at 54:20–23.

23       Mr. Valencia explained the procurement process began with a call to AJMR's
24   supplier.  *Id*. at 55:13–56:4.  AJMR would enquire as to the availability of diesel or gasoline
25   for purchase in the Tucson or Phoenix area.  *Id*.  Once AJMR ordered the fuel, the supplier
26   would provide the code for loading the fuel.  *Id*.  AJMR's transportation business partners
27   would go and pick up the fuel and bring it to AJMR's yard.  *Id*.  The fuel would then be set
28   for export.  Hr'g Tr. 8/22/2025 (Doc. 113) at 55:13–56:4.  Mr. Valencia testified that AJMR

1    hired various carriers, including but not limited to, KWW, L&J, Shannon Transport,

2    DRPT, and Villegas Tanks. *Id.* at 56:8–57:6.

3                    **2.  Judaean Group**

4        AJMR purchased fuel from Judaean Group.  Hr'g Tr. 8/22/2025 (Doc. 113) at

5    53:21–54:14, 57:7–11.  Judaean Group provided codes to AJMR for loading the fuel at the

6    Kinder Morgan facilities in either Tucson or Phoenix, Arizona. *Id.* at 53:21–54:14, 57:24–

7    58:5.  Mr. Valencia explained that in this case, Judaean Group had different suppliers. *Id.*

8    at 58:6–18.  Mr. Valencia testified that each supplier has X number of gallons on the tanks,

9    which is called an allocation. *Id.*  The Judaean Group representative would instruct AJMR

10    as to how many loads to pick-up, which indicated how much fuel they had on specific

11    codes. *Id.*

12        Mr. Valencia further testified that AJMR was receiving invoices from Judaean

13    Group for the billed amount.  Hr'g Tr. 8/22/2025 (Doc. 113) at 58:19–59:2, 62:7–15.  Mr.

14    Valencia also testified that AJMR was billed by Judaean Group almost every business

15    day—Monday through Friday. *Id.* at 55:6–12.  Those invoices requested a specific amount

16    be deposited, and AJMR was paying the invoice on the same day. *Id.* at 55:6–12, 59:4–6,

17    61:14–62:4, 62:24–63:10.  Mr. Valencia testified that of the fifty-three (53) invoices from

18    Judaean Group attached to AJMR's objection (Doc. 102), all were paid within twenty-four

19    (24) hours of receipt. *Id.* at 62:16–63:10, 82:22–25, 87:8–20, 88:13–18.  Mr. Valencia

20    observed that some of the BOLs received from Judaean Group did not match what they

21    had, so it is unclear what money AJMR could owe to Judaean Group at this time. *Id.* at

22    87:21–88:12.

23                    **3.  The Supply Chain**

24        Mr. Valencia testified that although the Bills of Lading named the supplier at the

25    top left corner, there is nothing to identify who Judaean's supplier was—Offen was not

26    identified on the BOL from Judaean and Mr. Valencia did not know that Offen was

27    Judaean's supplier in this case.  Hr'g Tr. 8/22/2025 (Doc. 113) at 59:16–60:4, 83:5–10.

28    Mr. Valencia further described Judaean Group as a broker and testified that he did not how

many brokers or sellers there were between Judaean Group and Offen. *Id*. at 60:20–61:13. Mr. Valencia also observed that because Judaean Group was a broker, it could purchase fuel from any number of suppliers. *Id*. at 64:25–65:6. Mr. Valencia explained that he would have liked to have known who was selling to Judaean, because it would have allowed him to try and cut out the middleman (Judaean Group) and get a better price. *Id*.

Mr. Valencia also testified that AJMR purchased fuel from brokers other than Judaean Group during the relevant time period. *Id*. at 64:25–65:15, 83:23–84:4. Mr. Valencia testified that at some point, approximately toward the end of November 2024, he was unable to get in contact with the owner of Judaean Group. Hr'g Tr. 8/22/2025 (Doc. 113) at 66:16–67:3. Shortly after, Mr. Valencia learned that the Judaean Group owner had been arrested. *Id*. at 68:6–9. During this time, AJMR continued to make payments to Judaean Group. *Id*. at 68:10–11. Mr. Valencia was then contacted by Tracy Johnson, the owner of Midnight Sun, the supplier one step up the chain from Judaean Group. *Id*. at 68:10–69:20. Mr. Valencia indicated that someone had given Ms. Johnson his phone number and she called and explained that Midnight Sun was a fuel supplier for Judaean Group, who had not paid her. *Id*. at 69:21–70:9.

Eventually, Mr. Valencia spoke with the Judaean Group owner, who approved of AJMR paying Midnight Sun, the supplier, directly. Hr'g Tr. 8/22/2025 (Doc. 113) at 71:5–16; *see* Def. AJMR's Hr'g Exhs. 1–3 (Doc. 109). Mr. Valencia further testified that Midnight Sun then invoiced AJMR and he immediately wire transferred the money to Ms. Johnson. *Id*. at 71:21–75:3.

### 4.  Fuel at Storage Yard

Mr. Valencia testified that AJMR rents space at the storage yard in Rio Rico. Hr'g Tr. 8/22/2025 (Doc. 113) at 76:16–19. Mr. Valencia indicated that AJMR has been renting there for approximately one (1) year and occupies approximately five (5) acres of the six (6) to seven (7) acre yard. *Id*. at 76:20–77:3. Mr. Valencia confirmed that there are storage tanks or trailers of fuel currently on the property. *Id*. at 77:4–6. Mr. Valencia explained that fuel loads arrive at the storage yard on a daily basis, but clarified this was prior to the

1    border closure in March and confirmed AJMR is not currently receiving fuel there. *Id.* at

2    77:23–25, 79:21–80:9, 86:10–14. Mr. Valencia further testified that AJMR currently has

3    gasoline and diesel at the storage yard and estimated that there are approximately sixty (60)

4    loads total, but did not know the quantity of each fuel type. *Id.* at 77:11–22.

5        Mr. Valencia testified that any fuel sitting at the storage yard has already been

6    invoiced to Gas Azul. Hr'g Tr. 8/22/2025 (Doc. 113) at 63:11–25, 79:12–20, 80:25–81:21.

7    Mr. Valencia reiterated that once he purchases fuel and transports it to his yard, the buyer

8    is responsible for picking it up. *Id.* at 63:11–25, 77:7–10. Mr. Valencia estimated that

9    there were approximately fifty (50) trailers at the storage yard owned by Gas Azul. *Id.* at

10   78:1–7. Mr. Valencia reported that AJMR owns five (5) storage tanks in the storage yard.

11   *Id.* at 78:8–14. Mr. Valencia further explained that when AJMR purchases fuel which goes

12   to the storage yard, it will go to Mexico in either the same tank that it arrived in or will be

13   transferred to a different tank. *Id.* at 78:15–23. The fuel currently stored by AJMR is there

14   due to the border shutdown into Mexico. Hr'g Tr. 8/22/2025 (Doc. 113) at 63:11–25,

15   78:24–79:3. Mr. Valencia further testified that the fuel currently stored at the yard was

16   purchased from Brad Hall and is waiting for pick up by Gas Azul. *Id.* at 64:1–7, 15–24.

17       Mr. Valencia also testified regarding the devastating effect that a fuel seizure would

18   have on his business. *Id.* at 75:4–20. This effect would only be compounded by the length

19   of the litigation. *Id.* at 75:21–76:2.

20

21   **II.    ANALYSIS**

22       Plaintiff Offen Petroleum, LLC seeks a writ of attachment pursuant to A.R.S. § 12-

23   1521(2) on "all of the fuel owned by AJMR and located at 799 E Frontage Road, Rio Rico,

24   Arizona 85648." Pl.'s Appl. for Writ of Attachment With Notice (Doc. 99) at 3.

25       ***A.    Legal Standards***

26   Section 12-1521, Arizona Revised Statutes, provides:

27   A plaintiff, after complying with the provisions of chapter 14 of this title,[]
     may in the following cases have the property of the defendant attached as
28   security for satisfaction of any judgment which may be recovered, unless the

defendant gives security to pay such judgment.

    1.   In an action upon contract, express or implied, for payment of money which is not fully secured by real or personal property, or, if originally so secured, the value of such security has without any act of the plaintiff or the person to whom the security was given, substantially diminished below the balance owed.

    2.   When an action is pending for damages and the defendant is about to dispose or remove his property beyond the jurisdiction of the court in which the action is pending.

    3.   In an action for damages or upon contract, express or implied, against a defendant not residing in this state or a foreign corporation doing business in this state.

    4.   In an action upon a judgment of any state.

A.R.S. § 12-1521. The procedures for provisional remedies referenced in Section 12-1521 are codified at A.R.S. § 12-2401 *et seq*. Section 12-2410(C) directs, in relevant part, that "[a]ny hearing on an application for any provisional remedy shall be limited to . . . [t]he probable validity of the applicant's claim or claims and any defenses and claims of personal property exemptions of the party against whom such provisional remedy will operate." A.R.S. § 12-2410(C). "If after hearing the court finds probable cause to believe the claim of the applicant is valid and that the statutory requirements for any provisional remedy have been met, such remedy shall be issued forthwith." A.R.S. § 12-2410(D).

     "Section 12-1522 requires that a writ of attachment be supported by an affidavit that 'show[s] any one or more of the requirements for a writ of attachment as set forth in section 12-1521.'" *Yauck v. West Town Bank & Trust*, 568 P.3d 386, 393 (Ariz. Ct. App. 2025). "Because conclusory affidavits are without evidentiary value, the factual showing required by § 12-1522 cannot be made by an affidavit consisting of conclusory assertions by an affiant who fails to establish personal knowledge of the matters set forth therein." *Id.* (citations omitted).

## B.   *Plaintiff's Affidavit is Insufficient*

     As noted in the previous section, an affidavit supporting an application for writ of attachment must be based upon "personal knowledge of the matters set forth therein."

*Yauck v. West Town Bank & Trust*, 568 P.3d 386, 393 (Ariz. Ct. App. 2025).

Here, Mr. Hackerott's affidavit indicated that he spoke with unnamed individuals at various companies "to determine who ultimately received them."  Pl.'s Appl. for Writ (Doc. 99), Hackerott Aff. (Exh. "1") at ¶ 4.  Mr. Hackerott then spoke with Aaron Fox from Shannon Transport, LLC; Mark Luitwieler from Total Energy Solutions; and Andy Sauffer from West Plains Propane.  *Id.* at ¶¶ 9–11.  Mr. Hackerott relied on information from these individuals regarding fuel being stored at AJMR.  *Id.*  Rule 602, Federal Rules of Evidence, requires a witness to have personal knowledge of the matter regarding which he is testifying.  Fed. R. Evid. 602.  Although Rules 801 and 805, Federal Rules of Evidence, apply to hearsay statements a witness testifies about, Rule 602 does "prevent him from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it."  Fed. R. Evid. 602 advisory committee's note to 1972 amendment.  Moreover, the Offen employees sent to investigate AJMR's fuel storage site did not provide any information regarding what fuel, if any, was actually present.  *See* Pl.'s Appl. for Writ (Doc. 99), Exh. "1" at ¶ 15 ("The investigation performed by said employees concluded that a number of commercial trailers and tanks (which presumably are still loaded with fuel) are still being held[.]").

Plaintiff had an opportunity to have any individuals with personal knowledge testify at the probable validity hearing.  Mr. Hackerott was their sole witness and his information remained second or third-hand.  An affidavit that does not give cause to believe that the declarant has any knowledge of the property owned by defendant lacks evidentiary value.  *Yauck*, 568 P.3d at 393.  As such, the Court finds that Plaintiff's Application "fail[ed] to meet basic statutory requirements necessary to secure the [requested] prejudgment remedies[.]"  *Id.*

### C.    AJMR Does Not Own the Fuel In Its Storage Yard

Mr. Valencia testified that any fuel sitting at the storage yard has already been invoiced to Gas Azul.  Hr'g Tr. 8/22/2025 (Doc. 113) at 63:11–25, 79:12–20, 80:25–81:21.  He was unequivocal that any fuel at the storage yard was owned by Gas Azul.  *See id.*

"In construing a statute, we begin with the plain words of the statute, employing the familiar canons of statutory construction."  *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024) (quotations and citations omitted); *see also American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982).  "If the plain language is clear, our inquiry is complete." *In re Saldana*, 122 F.4th at 341 (citations omitted); *American Tobacco Co.*, 456 U.S. at 68 (recognizing "the legislative purpose is expressed by the ordinary meaning of the words used.").  Section 12-1521(2) provides for a writ of attachment "[w]hen an action is pending for damages and the defendant is about to dispose or remove **his property** beyond the jurisdiction of the court in which the action is pending."  A.R.S. § 12-1521(2) (emphasis added).  The possessive "his" indicates the property relates to defendant.  *See His*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/his (last visited Oct. 22, 2025).

Here, the fuel in question is not owned by Defendant AJMR.[3]  Therefore, it is not "his property" as required by the attachment statute.  As such, probable cause does not exist to believe that the statutory requirements have been met for a writ of attachment.[4]  *See* A.R.S. § 12-2410(D).

### D.    Writ of Garnishment

Plaintiff asserts "[l]ike attachment, garnishment of non-exempt monies is a permitted provisional remedy under A.R.S. §§ 12-2401 *et seq*. and 12-1570 *et seq*. and may be appropriate here if the Court finds that AJMR does not hold an ownership interest in the fuel located at its storage yard in Rio Rico, Arizona."  Pl.'s Reply (Doc. 103) at 6.  Plaintiff further requests that "the Court permit Offen to garnish WaFd Bank, the financial institution from which AJMR allegedly sent payments to Defendants Judaean Group and

---

[3] At oral argument Plaintiff seemed to imply that the Court should do more than rely on Mr. Valencia's testimony to determine whether or not Defendant AJMR owns the property.  Hr'g Tr. 109:2–7.  Plaintiff bears the burden to demonstrate that it is entitled to a writ of attachment.  The Court declines the invitation to take on that burden.

[4] Plaintiff's counsel acknowledged this outcome in requesting prejudgment garnishment in the alternative.  Hr'g Tr. 8/22/2025 (Doc. 113) 94:2–9; *see also* Pl.'s Reply (Doc. 103) at 6.

1    Midnight Sun . . . and that is likely holding the amounts AJMR received for the fuel it sold

2    to the third party in Mexico." *Id.* at 6–7.

3          As an initial matter, "district court[s] need not consider arguments raised for the first

4    time in a reply brief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Plaintiff avers

5    that garnishment was not raised initially, because it did not know that AJMR "allegedly

6    did not own this fuel at the storage yard it leases." Hr'g Tr. 8/22/2025 (Doc. 113) at 106:4–

7    12. This lack of awareness underscores the insufficiency of the affidavit submitted with

8    its Application.

9          Plaintiff relies on Rule 64, Federal Rules of Civil Procedure, for its right to seek

10   garnishment. Rule 64 provides, in relevant part:

11         At the commencement of and throughout an action, every remedy is available
         that, under the law of the state where the court is located, provides for seizing
12         a person or property to secure satisfaction of the potential judgment. But a
         federal statute governs to the extent it applies.
13

14   Fed. R. Civ. P. 64(a). In reply, Plaintiff cited to A.R.S. § 12-1570 *et seq.* as the garnishment

15   statute. Pl.'s Reply (Doc. 103) at 6. Section 12-1570.01, Arizona Revised Statutes,

16   governs the Scope of Article regarding garnishment. Section 12-1570.01 states that "[t]he

17   provisions of this article are applicable to garnishments of any of the following" and

18   includes a list of situations, all of which refer to "a judgment debtor." A.R.S. § 12-

19   1570.01(A). The plain language of the statute indicates that being a judgment debtor is a

20   prerequisite to garnishment. Plaintiff, however, has failed to explain in what circumstance

21   Defendant AJMR could be considered a judgment debtor or how it is otherwise entitled to

22   garnishment under the statute. Accordingly, the Court denies Plaintiff's request for

23   garnishment.

24

25   **III.    CONCLUSION**

26         Based on the foregoing, the Court finds that Plaintiff has not met its burden to

27   establish entitlement to a writ of attachment. The Court further finds there is no probable

28   cause to believe "the statutory requirements for any provisional remedy has been met[,]"

1 including any right to garnishment.  A.R.S. § 12-2410(D).

2

3 **IV.    RECOMMENDATION**

4        For the reasons delineated above, the Magistrate Judge **RECOMMENDS** that the

5 District Judge enter an order **DENYING** Plaintiff's Application for Writ of Attachment

6 With Notice (Doc. 99).

7        Pursuant to 28 U.S.C. § 636(b) and Rule 72(b)(2), Federal Rules of Civil Procedure,

8 any party may serve and file written objections within fourteen (14) days after being served

9 with a copy of this Report and Recommendation.  A party may respond to another party's

10 objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P.

11 72(b)(2).  No replies shall be filed unless leave is granted from the District Judge.  If

12 objections are filed, the parties should use the following case number:  **CV-25-00061-**

13 **TUC-JCH**.

14        Failure to file timely objections to any factual or legal determination of the

15 Magistrate Judge may result in waiver of the right of review.

16

17        Dated this 23rd day of October, 2025.

18

19

20        Eric J. Markovich
         United States Magistrate Judge

21

22

23

24

25

26

27

28